<u>**NOT DESIGNATED FOR PUBLICATION**</u>

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2022 KA 0670

STATE OF LOUISIANA

VERSUS

RODNEY JACK STRAIN, JR.

**Judgment Rendered:** **JUN 0 1 2023**

\* \* \* \* \* \*

Appealed from the
Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket Number 0703-F-2019
The Honorable Ashly Bruce Simpson, Ad Hoc Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Warren L. Montgomery<br>District Attorney<br>Matthew Caplan<br>Assistant District Attorney<br>Covington, Louisiana | Counsel for Appellee<br>State of Louisiana |
| Gwendolyn K. Brown<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellant<br>Rodney Jack Strain, Jr. |

\* \* \* \* \* \*

**BEFORE: GUIDRY, C.J., WOLFE, AND MILLER, JJ.**

**GUIDRY, C.J.**

A grand jury indicted the defendant, Rodney Jack Strain, Jr., with committing the following offenses: aggravated rape (counts one through four); aggravated incest (count five); indecent behavior with a juvenile (count six); aggravated incest (count seven); and sexual battery (count eight).[1] He pled not guilty and, following a jury trial, was found guilty as charged on each count. The defendant subsequently filed a "motion for post-verdict judgment of acquittal, and alternative motion for a new trial," which the trial court denied in separate rulings.

Thereafter, the trial court sentenced the defendant on counts one through four to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on each count. On counts five and seven, the trial court sentenced the defendant to fifteen years imprisonment at hard labor and a $15,000.00 fine[2] on each count. On counts six and eight, the trial court sentenced the defendant to five years imprisonment at hard labor on each count, with count eight to be served without benefit of parole. The trial court further ordered the following: counts one through four to be served concurrently; counts five and six to be served concurrently but consecutive to the sentences imposed on counts one through four; counts seven and eight to be served concurrently but consecutive to the sentences imposed on counts one through six.

---

[1] Counts one through four were based on violations of La. R.S. 14:42. Counts five and seven were based on a violation La. R.S. 14:78.1. Count six was based on a violation of La. R.S. 14:81. And count eight was based on a violation of La. R.S. 14:43.1. In reference to counts one through four, in 2015, subsequent to the instant offenses, the Legislature renamed the offense of aggravated rape to first degree rape without any material alteration of the substance of the crime. See La. R.S. 14:42(E); 2015 La. Acts, Nos. 184, § 1 and 256, § 1. Herein, we reference the offenses by the previous name based on the dates the offenses were committed. In reference to counts five and seven, subsequent to the commission of the offenses, the Legislature repealed former La. R.S. 14:78.1 and amended La. R.S. 14:89.1 to include the crime of aggravated incest under the broader crime of aggravated crime against nature. See La. R.S. 14:89.1(A)(2)(a); 2014 La. Acts, No. 177, §§ 1 & 2; 2014 La. Acts, No. 599, § 1.

[2] Upon finding that imposition of a fine would not cause a substantial financial hardship on the defendant or his dependents, the trial court ordered that the defendant be imprisoned for a period of six months in the parish jail should he default on payment of the $15,000.00 fine imposed on counts five and seven.

2

The defendant now appeals, raising ten assignments of error that challenge several trial court rulings and the sufficiency of the evidence on counts five, seven, and eight. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS[3]

An investigation of the defendant for sexual abuse started in 2017, after Special Agent Timothy Lee Moore with the Internal Revenue Service (IRS) and Special Agent DeWayne J. Horner with the Federal Bureau of Investigations (FBI) interviewed S.K. (the victim in counts one through three) as part of an unrelated investigation of ownership interests in St. Tammany Workforce Solutions, L.L.C. (STWS), a work release program.[4] S.K. was then a major with the St. Tammany Parish Sheriff's Office (STPSO), overseeing its maintenance division. While being interviewed regarding STWS, S.K. revealed that the defendant sexually abused him when he was a child. The interview took place in the presence of S.K.'s wife and child. S.K. provided the agents with the names of four other potential victims of the defendant's sexual abuse: R.F. (not related to this case); M.F. (the victim in count four); A.D. (the victim in counts seven and eight); and R.P. (the victim in counts five and six), who was identified as the defendant's nephew.

For the sex crimes portion of the investigation, the special agents assigned an FBI child/adolescent forensic interviewer, Janetta Michaels, to assist in

---

[3] As the charged crimes are sex offenses, we will refer to the victims and their immediate family members by their initials only. See La. R.S. 46:1844(W); State v. Mangrum, 20-0243, p. 2 n.1 (La. App. 1st Cir. 2/22/21), 321 So. 3d 986, 989 n.1, writ denied, 21-00401 (La. 10/1/21), 324 So. 3d 1050. The defendant was convicted of eight offenses that involve four different victims.

[4] According to the special agents, the defendant converted the work release program from a publicly-run program into STWS, a privately-run limited liability company that was owned on paper by Allen Tingle, Brandy Hanson (the daughter of David Hanson, a captain in the St. Tammany Parish Sheriff's Office (STPSO)), and J.K. (S.K.'s son). Brandy and J.K. were former STPSO employees who resigned their employment to assume ownership of STWS, as ownership of the program while working for the STPSO was prohibited by state law. Brandy and J.K. had no active role in the program, and Tingle ran the operation. STWS had a contract with the STPSO, which was headed by the defendant, who was at that time Sheriff of St. Tammany Parish. David and S.K. used their children as "shell owners" so they could continue to work for the STPSO.

3

interviewing the alleged victims. They also brought in Trooper Malcolm Brown with the Louisiana State Police, and the District Attorney's Office assigned Agent Allyson Hoffine with the U.S. Postal Inspection Services to assist with the investigation.

Subsequently, the special agents interviewed M.F., who was incarcerated at the time. Early on during questioning by the special agents, M.F. broke down crying and stated that he had been sexually abused by the defendant as a child. M.F. did not, at that time, disclose that the abuse included penetration.

An interview with R.P. was set up next. The investigation bore out that in addition to being a STPSO employee, R.P. was receiving a $30,000.00 salary from STWS, though he had no active role in the program. R.P. started crying and appeared distraught as he confirmed to the special agents that he had been abused by the defendant. He declined an offer to meet with a forensic interviewer or specialist.

A couple of weeks later, the special agents interviewed A.D. A.D. confirmed that he was sexually abused by the defendant. In addition to interviewing the alleged victims, the agents interviewed family members and friends to whom the victims may have spoken about the alleged abuse before reporting the allegations to law enforcement. Trooper Brown determined that S.K. previously disclosed his claims to his wife, V.K., in 2011 or 2013. He further determined that R.P. first reported his sexual abuse claims to his mother prior to the investigation. The IRS interviews were memorialized, the forensic interviews were recorded, and the sexual abuse allegations were presented to the St. Tammany Parish District Attorney's Office in the spring of 2018. It was determined that the IRS and FBI would continue to investigate the work release

4

program, while Trooper Brown and Agent Hoffine, individuals unassociated with the STPSO, would investigate the sexual abuse allegations.[5]

### S.K. (Aggravated Rape, Counts 1-3):

At trial, S.K. testified that his date of birth is July 19, 1968, and that he knew and grew up around the defendant from about eight years old to adulthood. The defendant was five and a half years older than S.K.[6] S.K. testified that his family was poor and ultimately moved to property owned by the Strains when S.K. was between nine and eleven years old. S.K.'s parents worked at one of the Strain's local fireworks businesses twice a year (in July and December), and when S.K. was ten and eleven years old, he worked at the Mandeville fireworks stand with the defendant. S.K. testified that the defendant was like a brother to him and treated him very well. S.K. testified that when he was ten years old, while he and the defendant were spending nights at the fireworks stand, the defendant began initiating sexual contact with him.[7] S.K. testified the defendant was about two hundred pounds larger than him at the time and said he "played dead" during the acts. Later, when S.K. was an adult working at the STPSO, the defendant asked to have oral sex with S.K. in exchange for a vehicle that S.K. needed for his maintenance duties (or some other advantages at work), and the defendant would arrange for S.K. to engage in sexual acts with a female in the defendant's presence.

---

[5] The name of a potential fifth victim, R.R., arose during the course of the interviews. R.R., the defendant's cousin who was almost four years younger than the defendant, testified at trial about the defendant touching him inappropriately that progressed to penile-anal intercourse when he was between nine and eleven years old. R.R. is not involved in any of the offenses charged in the indictment for this case. Additionally, the defendant's wife, Lisa Strain, testified to a separate incident where, in 2015, her adopted sister made public accusations against the defendant. She was told that her sister later recanted the allegations.

[6] According to the grand jury indictment, the defendant's date of birth is November 28, 1962.

[7] S.K. detailed acts including the defendant fondling and touching S.K.'s penis and pulling S.K. up against him to cause S.K. to penetrate the defendant anally, as well as the defendant later performing oral sex on S.K. As a married adult raising children and struggling financially, S.K. accepted the defendant's offer to work for him at the STPSO. S.K.'s wife, their two sons, and his daughter-in-law also worked for the STPSO.

*M.F. (Aggravated Rape, Count 4):*

M.F. testified that he has known the defendant his whole life and also grew up around the defendant in Abita Springs.[8] M.F. was born on September 5, 1969, so he is about seven years younger than the defendant. When M.F. was about six or seven years old and weighed about 60 pounds, the defendant was thirteen or fourteen years old and weighed about 250 to 300 pounds at that time. M.F.'s parents and the defendant's parents were friends, and M.F. spent several days a week at the Strain residence. M.F. initially enjoyed swimming in the pond on the Strains' property while being supervised by the defendant. But, according to his testimony, when he was six or seven years old, while they were in the pond swimming on the Strains' property, the defendant started touching his private parts.[9] M.F. testified that the defendant was intimidating and threatened him, telling M.F. he "better not go back and say anything." M.F. stated the defendant was like a big brother and father to him. M.F. testified that over the years, as an adult, he would ask the defendant to provide things for him, and the defendant would do it "[b]ecause he knows what he did to me."

*R.P. (Aggravated Incest & Indecent Behavior with Juveniles, Counts 5 & 6):*

R.P. was thirty-four years old at the time of trial and his date of birth is June 23, 1987. R.P., also the defendant's nephew, testified that his mother and the defendant's wife are sisters. He also confirmed that A.D. is the son of another one of Mrs. Strain's sisters. He testified that he was very close with the defendant

---

[8] S.K. testified that he grew up with M.F., who was about a year younger than S.K., and confirmed that M.F. also grew up around the defendant. M.F. confided in S.K. and S.K.'s wife that he had been molested by the defendant.

[9] M.F. testified the defendant began by grabbing his hand and forcing M.F. to touch the defendant's penis, which then progressed to pushing and rubbing his penis against M.F.'s anus without penetration because "it wouldn't fit" and putting his mouth on M.F.'s penis underwater. M.F. testified that this conduct continued until M.F.'s early teenage years and escalated to the defendant making M.F. perform oral sex on the defendant, the defendant masturbating in M.F.'s presence and ejaculating on M.F., the defendant digitally penetrating M.F.'s anus, the defendant forcefully penetrating M.F.'s anus with his penis when M.F. was about ten or eleven years old, and the defendant causing M.F. to penetrate the defendant with his penis.

when he was about nine and ten years old and that between the ages of ten and fifteen years old, he stayed overnight at the Strain residence numerous times, would go hunting with the Strains, and would take trips with them.

R.P. testified that when he was around ten years old, while riding a four-wheeler with the defendant, the defendant put his hand "closer and closer" to R.P.'s inner thigh while moving his body closer to R.P. and putting his groin against him. As R.P. kept trying to move forward, the defendant would scoot closer to him. R.P. indicated that other inappropriate conduct occurred while hunting and at the Strain residence. For example, the defendant wanted R.P. to stand next to him to urinate. The defendant would also rub R.P.'s chest, touch R.P.'s groin area, and try to "play with [R.P.'s] pubic hair[.]" According to R.P., the defendant's acts progressed to the defendant touching and trying to stroke R.P.'s penis, sometimes causing R.P. to get an erection, and to the defendant telling R.P. to masturbate in his presence, while watching internet pornography. R.P. testified that the above described acts at the Strain residence would occur after the other members of the household went to sleep.

### A.D. (Aggravated Incest & Sexual Battery, Counts 7 & 8):

A.D. testified that he was thirty-three years old at the time of the trial and that he is the defendant's nephew, specifically adding that the defendant's wife is his mother's sister. He testified that their families were close and that he spent time at the Strain residence.[10] A.D. testified that he grew up around the defendant and used to go hunting and would hang out with the defendant and his family. He stated he attended events and slept overnight at the Strain residence where he was allowed to consume alcohol while in high school.

_____

[10] A.D. further testified that R.P. is his cousin (the son of one of A.D.'s mother's sisters) and that the defendant is R.P.'s uncle as well.

7

A.D. testified that when he was fifteen years old and in his sophomore year in high school, the 2004-2005 school year, he slept over at the defendant's residence because he had too much to drink that evening, and his uncle (the defendant) did not want him to drive. A.D. further testified that while asleep on the couch, he woke up between midnight and 2:00 a.m., when he felt the defendant's hand on his groin area. A.D. testified that he then rolled over in order to get the defendant's hand off of his groin, pretending to still be asleep. The defendant was between forty-one and forty-two years old at the time.

## ASSIGNMENTS OF ERROR NUMBERS 8 AND 9:
## SUFFICIENCY OF THE EVIDENCE ON COUNTS 5, 7, & 8

In assignments of error numbers eight and nine, the defendant challenges the sufficiency of the evidence of aggravated incest for counts five and seven and sexual battery for count eight. Regarding counts five and seven, the two counts of aggravated incest, he argues that based on the relationship between himself and the victims, R.P. and A.D., he cannot be said to have possessed the guilty knowledge necessary to support those convictions. He notes that he is related to R.P. and A.D. by way of marriage, because their mothers are his wife's biological sisters. The defendant argues that the Louisiana Supreme Court misinterpreted La. R.S. 14:78.1, the aggravated incest statute, in holding that it applies to people related by marriage as well as by blood or adoption. He further argues that this court should consider the issue anew in light of the fact that the legislature used the same language, after repealing La. R.S. 14:78.1, when it incorporated the crime of aggravated incest into the crime of aggravated crime against nature. Moreover, he argues that A.D.'s testimony was based on leading questions and lacked credibility due to his equivocation. Regarding count eight, sexual battery, the defendant

contends that the touching of the "groin" is not a prohibited act under La. R.S. 14:43.1, the statute governing sexual battery.[11]

When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So. 2d 731, 734 (La. 1992); State v. Duhon, 18-0593, pp. 10-11 (La. App. 1st Cir. 12/28/18), 270 So. 3d 597, 609, writ denied, 19-0124 (La. 5/28/19), 273 So. 3d 315. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proven beyond a reasonable doubt. Hearold, 603 So. 2d at 734; Duhon, 18-0593 at p. 11, 270 So. 3d at 609.

Thus, in reviewing claims challenging the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt based on the entirety of the evidence, both admissible and inadmissible, viewed in the light most favorable to the prosecution. See Jackson, 443 U.S. at 319, 99 S.Ct. at 2789; State v. Oliphant, 13-2973, p. 5 (La. 2/21/14), 133 So. 3d 1255, 1258-59 (per curiam); see also La. C.Cr.P. art. 821(B); State v. Mussall, 523 So. 2d 1305, 1308-09 (La. 1988); State v. Livous, 18-0016, p. 3 (La. App. 1st Cir. 9/24/18), 259 So. 3d 1036, 1039-40, writ denied, 18-1788 (La. 4/15/19), 267 So. 3d 1130. A conviction based

---

[11] As discussed above, on appeal, the defendant challenges the sufficiency of evidence regarding three of the offenses, aggravated incest on counts five and seven and sexual battery on count eight. These offenses involve two victims, R.P. (aggravated incest) and A.D. (aggravated incest and sexual battery). Thus, counts one, two, three, four and six are not addressed in this section. In challenging the sufficiency of the evidence for counts five, seven, and eight, the defendant challenges A.D.'s credibility (not R.P.'s), his relationship with the victims of aggravated incest (R.P. and A.D.), and the act (touching A.D.'s groin) used to prove sexual battery in this case.

on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, La. Const. art. I, § 2. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. Patorno, 01-2585, p. 5 (La. App. 1st Cir. 6/21/02), 822 So. 2d 141, 144. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Dyson, 16-1571, p. 10 (La. App. 1st Cir. 6/2/17), 222 So. 3d 220, 228, writ denied, 17-1399 (La. 6/15/18), 257 So. 3d 685.

Under former La. R.S. 14:78.1(A) (prior to repeal by 2014 La. Acts, Nos. 177, § 2 & 602, § 7), aggravated incest (counts five and seven) was defined, in pertinent part, as the engaging in any enumerated prohibited act with a person who is under eighteen years of age and who is known to the offender to be related to the offender as a "biological, *step*, or adoptive" nephew. (Emphasis added). Prohibited acts under former La. R.S. 14:78.1(B)(1) and (2), in pertinent part, included sexual battery (later defined herein), indecent behavior with juveniles, or "[a]ny lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both." The word "lewd" means lustful or indecent and signifies that form of immorality that relates to sexual impurity carried on in a wanton manner. It is identified with obscenity and measured by community norms for morality. The word "lascivious" means tending to incite lust, indecent, obscene, and tending to deprave the morals in respect to sexual relations. State v. Brown, 20-0150, p. 7 (La. App. 1st Cir. 2/19/21), 2021 WL 650816, *4, writ denied, 21-00458 (La. 6/1/21), 316 So. 3d 835. Pursuant to La. R.S. 14:43.1(A)(1) and (2) (prior to amendment by 2015 La. Acts, No. 256, § 1), sexual battery (count

10

eight) was defined, in pertinent part, as the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender without the consent of the victim.

Aggravated incest and sexual battery are general intent crimes; thus, the only intent necessary to sustain a conviction is established by the very doing of the proscribed acts. See La. R.S. 14:11; Brown, 20-0150 at p. 9, 2021 WL 650816 at *5. General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2).

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Dorsey, 10-0216, pp. 43-44 (La. 9/7/11), 74 So. 3d 603, 634, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). Further, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Smith, 22-0231, p. 7 (La. App. 1st Cir. 11/4/22), 354 So. 3d 697, 702. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See State v. Calloway, 07-2306, pp. 1-2 (La. 1/21/09), 1 So. 3d 417, 418 (per curiam). Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Lavy, 13-1025, p. 6 (La. App. 1st Cir. 3/11/14), 142 So. 3d 1000, 1006, writ denied, 14-0644 (La. 10/31/14), 152 So. 3d 150.

11

***R.P.'s Testimony (Aggravated Incest, Count 5):***

R.P. testified that his biological father spent a lot of time in jail and was no longer in his life by the time he was ten or eleven years old. The defendant stepped up to fill that void. R.P. stated that his uncle and aunt, the defendant and Mrs. Strain, played a large role in raising him as a child and that he would stay at their house almost every weekend and more so during hunting season and in the summertime. R.P. experienced a lot of "firsts" in his life with the defendant's family, including his first trip to Disney World, his first time hunting, and his first time riding four wheelers.

R.P. recalled the defendant making inappropriate comments while he was at the Strain residence about the size of R.P.'s penis, his pubic hair growth, and inquiries about masturbation. R.P. testified that the defendant's actions on the four-wheeler -- touching R.P. in and/or around his inner thigh and putting his groin against him -- felt inappropriate. R.P. would "freeze" and would not say anything during the acts. He said he would try to block it out while it was occurring and was afraid to tell anyone. R.P. stated that he had not had any sexual experiences prior to the defendant's conduct and was confused by the acts. He ultimately started wearing two pairs of underwear while visiting the defendant's residence in an attempt to discourage the acts. R.P. also testified about an inappropriate incident that occurred when the defendant came to visit him when R.P. was nineteen years old and serving in the Coast Guard.

After R.P. got out of the Coast Guard in 2011, he returned home and sought employment with the defendant.[12] In 2012, while the two of them were at a restaurant, R.P. told his mother, J.M., about him being molested by the defendant after she mentioned claims made by one of his aunts (his mother's adopted sister).

---

[12] At some point, the defendant and Mrs. Strain also gave R.P. and his wife a deal on buying some property next door to the defendant's home.

R.P. asked his mother not to tell anyone. A.D. and R.P. subsequently disclosed to each other that they had been abused but did not discuss details. R.P. told his wife about the abuse after he learned that the FBI was investigating the defendant regarding STWS.

R.P. further mentioned that when he was deciding whether to speak with the district attorney's office about being molested by the defendant, he had a highly emotional phone call with his mother, during which he told his mother that "[the defendant] needs to pay for what he did." R.P. confirmed that he sought counseling and would sometimes self-medicate by drinking a lot. On cross-examination, after listening to a recording of a phone call that took place in October or November 2017, R.P. admitted telling his mother during that phone call that he felt like the FBI was blackmailing him into providing pedophile information against the defendant based on his involvement with the work release program.

***A.D.'s Testimony (Aggravated Incest & Sexual Battery, Counts 7 & 8):***

In addition to testifying that the defendant touched his groin while he was asleep, A.D. testified that the defendant would sometimes make comments about the size of A.D.'s penis. A.D. joined the Marine Corps after graduating from high school in 2007 and left St. Tammany Parish. When he returned, he lived with R.P. In 2011 or 2012, A.D. received a phone call from his mother asking if his uncle had made any sexual advances towards him. He told his mother the defendant had not. A.D. testified that soon thereafter, he told R.P. that the defendant molested him, and R.P. told A.D. what happened to him as well. A.D. did not discuss it with anyone else until October of 2017, when he was approached by the FBI and relayed the account given at trial. After the 2017 interview, A.D. met with the defendant. The defendant gave him a hug and told him, "I'm sorry if I ever hurt you in any way. I'm sorry." A.D. recalled that the defendant then asked if the

13

investigating agents had spoken to R.P. and, after A.D. confirmed to him that they had, the defendant commented, "[h]ey, they just want to know if I f***** him."

In 2018, A.D. approached Trooper Brown and told him that he did not want to be a part of the case, saying that he did not remember the incident. A.D. admitted that he also told the defendant's attorney and one of his cousins that the molestation did not happen. However, A.D. repeatedly confirmed that his testimony that the defendant molested him was truthful and that he just wanted to get out of testifying and participating in the case. A.D. indicated that he only testified before the grand jury and at trial because he was subpoenaed to do so.

### *Other Pertinent Trial Witnesses:*

Lisa Strain, the defendant's wife, confirmed that she is the aunt of R.P. and A.D., sons of her biological sisters, J.M. (R.P.'s mother who also testified at trial) and K.L. (A.D.'s mother). Mrs. Strain testified that when he was a child, R.P. stayed at their house every weekend for a couple of months during hunting seasons. She further testified that it was not out of the ordinary for him to sleep over. Mrs. Strain also confirmed that the defendant took a one-day hunting trip to Destin by himself when R.P. was stationed there.

Further, Mrs. Strain specifically confirmed that A.D. sometimes stayed at their residence when he was in high school. She testified regarding "an occasion" in 2004, when children in the household, including the Strains' son, drank alcohol. Mrs. Strain denied seeing A.D. drinking, but stated that by the end of the evening, she was aware that he stayed at their house because he drank too much. She testified that she and the defendant heard her son vomiting while A.D. was asleep on the sofa. Mrs. Strain further testified that A.D. was sleeping on his back and that they told him to roll over out of concern that he might get sick.

Mrs. Strain confirmed that she spoke to her sister, J.M., about R.P. in person and by phone calls and text messages between December 2, 2017 and December

14

18, 2017. Mrs. Strain asked J.M. for permission to confront the defendant about R.P.'s claims, and J.M. agreed that she could do so. Mrs. Strain also reached out to her other sister, K.L., about A.D. being a potential victim. Mrs. Strain confirmed that she sent a text message to her sister stating that the defendant spoke to A.D. She confirmed that she told J.M., "[y]ou have had five years, I have had two weeks to process this." When confronted, the defendant denied the allegations of each alleged victim. Mrs. Strain testified she never witnessed any inappropriate behavior between the defendant and A.D. or R.P., and she was shocked by the allegations against her husband.

As noted, R.P.'s mother, J.M., also testified at the trial. J.M. testified that when he was ten and eleven years old, R.P. would cry a lot at night, would want to sleep with her, and would have random "crying fear spells." J.M. confirmed that in 2012, while they were conversing at a restaurant about claims against the defendant made by her adopted sister, R.P. first told her that the defendant had done something to him. J.M. did not comply with R.P.'s request to keep it a secret, but instead told her sister, K.L., and eventually her husband. R.P. ultimately threatened to never speak to J.M. again if she continued to speak about it. Thus, J.M. made the decision to "keep [her] son" and keep quiet about the issue.[13]

The final witness at trial, Dr. Scott Anthony Benton with the University of Mississippi Medical Center, testified as an expert in the field of child abuse pediatrics. Dr. Benton confirmed that most children who have been sexually abused do not immediately disclose the abuse. He noted that the state of Mississippi had received tens of thousands of cases per year that were delayed disclosures. He noted that many victims have no concept of sex or homosexual activity and are not prepared for what happened to them. He further confirmed that

---

[13] J.M. confirmed that she started recording her phone calls in March of 2018, after she learned about the FBI investigation of the defendant.

external factors, such as the grooming process, bribes, or threats, and internal factors, such as the fear of homosexuality and embarrassment, could cause a victim to not disclose the abuse. Dr. Benton also testified that it was very common for victims to recant after a disclosure, stating, "[w]ell, children naively, and sometimes even adults, think that if I take it back everything resets to zero ... that's the hope when they take it away or at least they'll leave me out of the process." Dr. Benton noted that many of the victims testifying at the defendant's trial consistently stated that they had no concept of sex or homosexual activity when the abuse began, which Dr. Benton called "the concept of naivete" that is typical of children. Based on his assessment of A.D.'s trial testimony, Dr. Benton believed that at fifteen years old, A.D.'s experience was unexpected, as he was "naïve" and "had no knowledge or preparation" for the abuse A.D. described at trial. Dr. Benton further testified that the consequences of the acts often lead to various psychiatric and psychological disorders, alcoholism, and substance abuse.

We reiterate that the defendant, in addition to challenging A.D.'s credibility, challenges the sufficiency of the evidence of aggravated incest on counts five and seven based on his relationship by marriage with the victims in those counts, R.P. and A.D. Specifically, the defendant argues that pursuant to former La. R.S. 14:78.1, the crime of aggravated incest (now incorporated into the broader crime of aggravated crime against nature) applied to relationships by blood, not by marriage. As the defendant concedes, the Louisiana Supreme Court has addressed relationships of affinity in the context of aggravated incest.

In State v. Ardoin, 09-0578 (La. 5/11/10), 35 So. 3d 1065 (per curiam), the defendant therein was convicted of the aggravated incest of his wife's niece, and thus, the defendant's niece by marriage. The defendant argued on appeal that he was not related to the victim, as a biological, step, or adoptive relative. The Louisiana Supreme Court stated:

[B]ecause aggravated incest encompasses not only biological and adoptive relationships but also step relationships, the crime is one of both consanguinity and affinity. *See Black's Law Dictionary* 1413 (6th ed. 1990)(the word "step-" "[w]hen used as [a] prefix in conjunction with a degree of kinship, is repugnant to [a] blood relationship, and is indicative of a relationship by affinity."); *Black's Law Dictionary* 67 (9th ed. 2009)(affinity is "[t]he relationship that one spouse has to the blood relatives of the other spouse; relationship by marriage.").

Ardoin, 09-0578 at p. 4, 35 So. 3d at 1067. As the Ardoin court further stated, "[t]he doctrine of affinity grew out of the canonical maxim that the husband and wife are one. It is the relationship which arises, in consequence of marriage, between one spouse and the blood relatives of the other. Thus, the husband stands in the same degree of affinity to his wife's blood relatives as she stands to them by consanguinity, and vice versa." Ardoin, 09-0578 at p. 4, 35 So. 3d at 1068 (citation omitted).

The language of former La. R.S. 14:78.1(A) specifically included "step" relations, which clearly indicated that relatives by marriage were included in the offense. When the legislature repealed La. R.S. 14:78.1 and amended La. R.S. 14:89.1 to include the crime of aggravated incest under the broader crime of aggravated crime against nature, it again specifically included "step" relations in the scope of the crime. See 2014 La. Acts, No. 177, §§ 1 and 2; 2014 La. Acts, No. 599, § 1. Thus, we disagree with the defendant's contention that this issue should be revisited based on the incorporation of the offense into the crime against nature offense. The evidence establishes that the defendant was aware of his familial relationship with the victims and used it to his advantage in engaging in prohibited touching of both R.P. and A.D. Further, the testimony presented at trial showed that both R.P. and A.D. were under the age of eighteen years old when the acts occurred.

Likewise, this court disagrees with the defendant's challenge of the sufficiency of the evidence of sexual battery on count eight based on the argument

17

that the touching of the "groin" is not a prohibited act under La. R.S. 14:43.1. As the Louisiana Supreme Court noted in State v. Layton, 14-1910, p. 7 (La. 3/17/15), 168 So. 3d 358, 361-62 (citing La. C.E. art. 412 Comments-1998), La. R.S. 14:43.1 is among the statutes that proscribe "sexually assaultive behavior." "Sexually assaultive behavior" is a general expression intentionally used by the legislature in order to reference a broad range of behavior not limited by any list of "technical" statutory definitions. Layton, 14-1910 at p. 7, 168 So. 3d at 362. Noting that the term "sexually assaultive behavior" is not defined by the statute at issue in that case, La. C.E. art. 412.2, the Layton court looked to the federal rule that inspired the legislature to draft Article 412.2. Specifically, the court noted that under Rule 413 of the Federal Rules of Evidence, a sexual assault is defined as "any conduct prohibited by 18 U.S.C. chapter 109A." Layton, 14-1910 at p. 6 n.5, 168 So. 3d at 361 n.5. In accordance with 18 U.S.C. chapter 109A,[14] "sexual contact" is defined as "the intentional touching ... of the genitalia, anus, **groin**, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." (Emphasis added.) See Layton, 14-1910 at p.6 n. 5, 168 So. 3d at 361 n.5 (citing 18 U.S.C. § 2244 and 18 U.S.C. § 2246(3)[15]). Applying the Layton analysis to the instant case, we find that the touching of the groin falls squarely within the definition of sexual battery in La. R.S. 14:43.1(A)(1). Thus, we are not persuaded by the defendant's argument that evidence of touching A.D.'s groin was insufficient to convict him of sexual battery against A.D.

---

[14] Chapter 109A, titled "Sexual Abuse," consists of 18 U.S.C. §§ 2241-2248.
[15] Although not mentioned by the court in Layton, we further observe that 18 U.S.C. § 2246(3) includes a reference to the intentional touching being "either directly or through the clothing" in the definition provided in that statute.

Furthermore, the verdicts rendered in this case indicate that the jury rejected the defendant's theory that A.D. lacked credibility. A.D. admitted that he previously recanted his claim, explained why, and maintained that he was being truthful at trial. Additionally, the jury heard expert testimony regarding the commonality of recantations and delayed disclosures. In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See State v. Ordodi, 06-0207, p. 14 (La. 11/29/06), 946 So. 2d 654, 662.

## ASSIGNMENTS OF ERROR NUMBERS 1-4:[16]
## ADMISSION OF OPINION TESTIMONY

In assignments of error numbers two through four, the defendant argues that the trial court erred in admitting opinion testimony of three witnesses. First, in assignment of error number two, he notes that he filed a pretrial motion to exclude and/or limit expert testimony by Thomas Mitchell regarding M.F.'s Post-Traumatic Stress Disorder (PTSD) diagnosis and argues that Mitchell's testimony was presented as "subterfuge for speaking to the ultimate question of fact[.]" He argues the State introduced the expert testimony regarding M.F.'s diagnosis to prove that sexual abuse occurred. In assignment of error number three, he argues that the trial court erred in admitting opinion testimony by a lay witness, Agent Hoffine, to bolster M.F.'s credibility. In assignment of error number four, he argues the trial court erred in admitting prejudicial text messages between Mrs. Strain and her sister, J.M.

---

[16] In assignment of error number one, the defendant challenges the trial court's denial of his motion for new trial in conjunction with assignments of error numbers two through seven that raise various grounds for a new trial. In addressing the grounds for new trial raised on appeal, where appropriate, this court has combined some assignments of error based on the nature of each ground.

*Thomas Mitchell (Assignment of Error #2):*

Prior to trial, the State filed an initial and supplemental "Notice of Expert" regarding its intent to present testimony by Thomas Mitchell, a licensed counselor and the executive director of the Children's Advocacy Center Hope House, as an expert in the field of mental health disorder counseling and PTSD. The defendant subsequently filed a "Motion to Exclude, or, in the Alternative, to Limit Expert Testimony." At a pretrial hearing, with regard to Mitchell, defense counsel argued that evidence of the PTSD diagnosis was inadmissible under State v. Chauvin, 02-1188, p. 9 (La. 5/20/03), 846 So. 2d 697, 703, to show sexual abuse by the defendant occurred. The State argued evidence of the PTSD diagnosis is admissible under Chauvin if the defendant attacks a witness's credibility to show why a victim may behave a certain way. The trial court took note of the fact that M.F.'s credibility would be attacked at trial based on his criminal record and that the State would use the PTSD evidence to rehabilitate M.F. The parties initially agreed that the State could introduce the diagnosis without implying that the condition was caused by abuse by the defendant. After additional argument, the trial court reiterated that at trial Mitchell would not be allowed to link the PTSD to sexual abuse or to specify that the allegation of abuse pertained to the defendant.

During the trial, prior to Mitchell's testimony, the State asked the court to revisit its ruling. The State argued that defense counsel suggested multiple times that M.F.'s statements were inconsistent and that he was motivated by a lawsuit. The State further argued that during opening statements, defense counsel erroneously claimed that a State expert was not advised of any penetration. Defense counsel countered that Mitchell was not a fact witness and argued that his testimony would usurp the jury's function. In reversing its pretrial ruling limiting Mitchell's testimony, the trial court, in part, noted that when the initial ruling was made, it was unaware that the defendant would elicit testimony to challenge the

20

motivation of the witness as a primary defense. The trial court set aside its prior ruling based on the fact that Mitchell actually provided treatment to M.F.

At trial, Mitchell was qualified as an expert in diagnosing PTSD for the purpose of mental health disorder counseling. During his trial testimony, Mitchell defined PTSD as a human response to a life-threatening or extremely traumatic stressor. He further testified that PTSD causes avoidance, anxiety, and hypervigilance. He stated that M.F. became his client on July 9, 2019, after a referral regarding an individual experiencing severe distress and challenges. Mitchell further testified that based on a "clinically structured interview" and self-reported assessment by M.F., it was clear that he was dealing with a case of PTSD. He noted that M.F. identified that he had been the victim of sexual abuse by another male, whom he identified as the defendant, and described in generalities the abuse he experienced. Despite some avoidance, M.F. subsequently disclosed that the abuse consisted of oral, anal digital penetration, and anal penile penetration. Mitchell noted that while M.F. also disclosed physical and verbal abuse by his father, he had a higher amount of sensitization (severe panic, distress, outbursts of anger, irritability, and sobbing) while talking about the sexual abuse. Mitchell described M.F. as one of the worst cases of PTSD that he ever treated based on M.F.'s intense state of pain and suffering, and because he met almost every PTSD diagnostic criterion. He noted that M.F. suffered from nightmares among other symptoms. Mitchell observed M.F. testifying in court and noted that he saw him using one of the breathing exercises that he taught him. PTSD was Mitchell's provisional and final diagnosis.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is

21

based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. La. C.E. art. 702(A). Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. La. C.E. art. 704. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused. La. C.E. art. 704. The credibility of a witness may not be supported unless it has been attacked. La. C.E. art. 607(B).

In Chauvin, the defendant was convicted of indecent behavior with juveniles. Chauvin, 02-1188 at p. 1, 846 So. 2d at 698. At trial, the State presented the expert testimony of a licensed clinical social worker who testified that one of the victims was diagnosed with PTSD. Id. at p. 3, 846 So. 2d at 699. The social worker then testified that the symptoms of PTSD were consistent with a child who had been sexually abused. Id. at p. 4, 846 So. 2d at 700. The Chauvin court found that PTSD is sufficiently recognized in the medical, and particularly the psychiatric, community to be considered as the proper subject of expert testimony. Id. at p. 11, 846 So. 2d at 704. However, the court further found that there was no evidence in the record that the trial court performed its "gatekeeping" function of determining that the social worker's testimony was relevant and reliable "as substantive proof that sexual abuse occurred." Id. at p. 12, 846 So. 2d at 705. The court stated, "[w]e are concerned about the use of PTSD evidence as substantive evidence that sexual abuse has occurred, when such evidence is not limited to explaining 'superficially bizarre' reactions common to victims of child sexual abuse but which are uncommon to the experience of jurors." Id. at pp. 14-15, 846 So. 2d at 707.

The Chauvin court noted that there was no evidence in that case that the victims recanted their allegations. Further, although the defense showed there had

been a slight delay between the date of the incidents and the reporting to the police, the State did not limit the testimony in an attempt to explain delayed reporting. Thus, under these circumstances, the court found that the State introduced the expert testimony regarding the victim's diagnosis of PTSD for the purpose of substantively proving that sexual abuse occurred. The court held that the evidence of the victim's PTSD diagnosis should be admissible only for the limited purpose of explaining, in general terms, certain reactions of a child to abuse that would be used to attack the victim/witness's credibility. Id. at pp. 16-18, 846 So. 2d at 708-09.

In State v. Griffin, 15-1765, p. 10 (La. App. 1st Cir. 4/27/16), 2016 WL 2840309, *6, this court found the testimony of a nurse practitioner proper where there was a "critical difference" between her testimony and that at issue in Chauvin. In Griffin, this court noted the nurse practitioner did not "rely upon a collateral diagnosis, such as ... PTSD, to conclude a finding of sexual abuse." Id. Further, the nurse practitioner did not "definitively state" the victim had been sexually abused, but instead agreed with the State "that her observations of the victim's demeanor, as well as the physical findings, were 'consistent with a child who has been abused,' even with a normal physical examination." Id. This court found the testimony "had a twofold effect outside of simply serving to bolster the victim's credibility." Id. at p. 11, 2016 WL 2840309 at *6. First, the testimony served to demonstrate that victims of childhood sexual trauma "often do not present signs of physical trauma from the abuse." Id. Second, the general description of delayed reporting assisted the jury in understanding the "'superficially bizarre' circumstances" in the case. Id.

Similarly, in the instant case, Mitchell did not use the PTSD diagnosis to conclude that M.F. suffered from sexual abuse. Unlike the victims in Chauvin, in this case M.F. was cross-examined about previous denials as to the occurrence of

23

specific acts and his significant delay in reporting certain claims. Thus, Mitchell's testimony was introduced to assist the trier of fact in understanding the victim's delayed disclosure of the abuse. The State did not offer the testimony to prove sexual abuse, but instead to explain the behavior of victims of childhood trauma and to assist the jury in understanding such reactions as delayed or inconsistent reporting and avoidance. We find no error in the trial court's admission of the testimony by Mitchell.

However, we note that Mitchell named the defendant as the perpetrator of the sexual abuse claims, described M.F. as having one of the worst cases of PTSD he has ever treated, and stated that the PTSD symptoms were heightened when M.F. discussed the claims against the defendant as opposed to other traumatic experiences. Nonetheless, even if we were to conclude that the testimony crossed the line discussed in Chauvin and Griffin, we find any error in the admissibility of the testimony harmless in this case. The proper analysis for determining harmless error "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); See also State v. Johnson, 94-1379, p. 14 (La. 11/27/95), 664 So. 2d 94, 100-01 ("Trial error occurs during the presentation of the case to the trier of fact and may be quantitatively assessed in the context of the other evidence to determine whether its admission at trial is harmless beyond a reasonable doubt."). M.F. testified in great detail and did so consistently regarding the abuse he suffered by the defendant. He readily admitted that, as an adult, he used the abuse to induce the defendant to do things for him. Given the more substantial evidence properly admitted against defendant, we find any error in the admission of the testimony of Mitchell harmless beyond a

24

reasonable doubt. See State v. Mullen, 18-0643, p. 21 (La. App. 1st Cir. 12/21/18), 269 So. 3d 772, 786-87, writ denied, 20-00408 (La. 10/6/20), 302 So. 3d 529.

***Agent Hoffine (Assignment of Error #3):***

The defendant complains that the following testimony demonstrates Agent Hoffine's articulation of improper and prejudicial opinions of M.F.'s differing accounts:

> Q. Just to be clear, did [M.F.] always say that [the defendant] placed his penis in his anus?
>
> A. No. The first time in [prison] when we interviewed him he stated that he was digitally and penile [sic] penetration is what he stated. But he wouldn't go into any details regarding that. And unfortunately in order for us to meet statutory requirements we have to ask for those details to find out whether or not there was true penetration, however slight.
>
> Q. You are aware that prior to that interview he had been interviewed by Janetta Michaels not talking about penetration, correct?
>
> A. Correct. And I reviewed that video and what I observed in the video itself, and this is not a slight to Janetta's professionalism in any way, shape, or form, due to the fact that he was in prison and she is a civilian and not a sworn law enforcement officer she had to have someone present with her at the jail, which was Agent Wayne Horner, who again is a male. And he's not a meek male. And also present at the jail were three other additional males observing.
>
> Q. Agents, correct?
>
> A. Agents.
>
> Q. So we are in a jail with other males present. Now, males aren't always a problem, correct?
>
> A. No. But remember that [M.F.] --
>
> [DEFENSE COUNSEL]: Objection.

After the trial court overruled the objection, Agent Hoffine further explained:

> A. Well, certain victims, and [M.F.] being one of them, he had an association of penile penetration associated with homosexuality in his mind. So with four men present even with a forensic interviewer he is still going to have to overcome that in order to say it out loud.

25

The defendant further argues Agent Hoffine "opined extensively on various points" of corroboration of both M.F.'s and R.P.'s accounts. The defendant provides a record cite that includes the following colloquy regarding R.P.:

Q. How did you establish a relationship with [R.P.]?

A. [R.P.] was difficult to establish a relationship with. And in part, see, the first interaction he had with the FBI in the gas station, that's a very unfortunate location for an interview to discuss any sexual abuse. [R.P.] specifically struggled at length with his wavering of cooperation, do I want to cooperate or not. And that's distinctly tied to it's essentially a destruction of his family. The amount of pressure that [R.P.] was under strictly because of where he is, I mean, his aunt is –

Q. I don't want you to go into his mental state and his own struggles, but just what the two of you discussed. You can't opine about his internal thoughts.

A. Understood.

Q. So was he expressing to you at times wanting to cooperate and not wanting to cooperate?

A. Yes.

The defendant further provides a record cite that contains the following testimony regarding R.P.'s disclosure to his mother at a restaurant:

Q. And importantly, one of the important things, other than -- I don't want to get into all of the confronting [the defendant] and all of that, that's already happened -- but importantly towards the end of the text messages as playing out in realtime between two sisters fighting about what's kind of happening, did you obtain additional independent corroboration, if believed, from the phone of [J.M.] that talks about how long ago that she's known?

A. Yes. She says she has known for five years. It's 2017. It corroborated the date that they told us ... about that they had met at the Chimes in 2012.

The testimony of a lay witness in the form of opinions or inferences, who is not testifying as an expert, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. C.E. art. 701. A reviewing court must ask two questions to determine whether the trial

26

court properly allowed lay opinion testimony: 1) was the testimony speculative opinion evidence or simply a recitation of or inferences from facts based upon the witness's observations; and 2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. State v. Morgan, 12-2060, p. 14 (La. App. 1st Cir. 6/7/13), 119 So. 3d 817, 827.

The defendant argues that Agent Hoffine's testimony consisted of improper lay opinion testimony that served to bolster the credibility of M.F. and R.P. At the outset, we note that there was no contemporaneous objection to the testimony regarding R.P.'s wavering on his level of cooperation or the corroboration for the date that he disclosed the abuse to his mother. An irregularity cannot be availed of after the verdict unless it was objected to at the time of the occurrence. La. C.Cr.P. art. 841(A). The contemporaneous objection rule has two purposes: to put the trial judge on notice of the alleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. State v. Lanclos, 07-0082, 07-0716, p. 6 (La. 4/8/08), 980 So. 2d 643, 648. Accordingly, the defendant did not properly preserve for appellate review these portions of Agent Hoffine's testimony. Moreover, regarding M.F., we note that Agent Hoffine did not give a direct opinion as to whether or not penetration occurred. She instead made natural inferences based on the circumstances of the interview. It is well settled that a lay witness is generally permitted to draw reasonable inferences from his or her personal observations. If the testimony constitutes a natural inference from what was observed, no prohibition against it as the opinion of a non-expert exists as long as the lay witness states the observed facts as well. State v. LeBlanc, 05-0885, p. 7 (La. App. 1st Cir. 2/10/06), 928 So. 2d 599, 603. Thus, we find no error in the admission of Agent Hoffine's testimony regarding M.F.

***Text Messages (Assignment of Error #4):***

Finally, the defendant argues that text messages between Mrs. Strain and her sister, J.M., contained impermissible opinionated statements. While Mrs. Strain was on direct examination, the trial court sustained defense counsel's objections to the State's attempt to elicit testimony from Mrs. Strain regarding her knowledge of the potential victims, from whom she learned of the potential victims, and whether or not she and her sister communicated about confronting the defendant. During a bench conference, the State indicated that it was going to inquire about text messages between Mrs. Strain, her sister, and the defendant, specifically conversations in which Mrs. Strain became aware of R.P.'s allegations. Defense counsel argued the text messages were prejudicial where Mrs. Strain's opinion or skepticism as to the defendant's guilt was irrelevant and the messages contained hearsay. Based on the timing of the messages and the State informing the court that the messages did not contain an opinion as to the defendant's guilt or innocence, the trial court reversed its prior ruling sustaining the defense counsel's objection and found the text messages admissible.

Mrs. Strain testified that when her sister, J.M., told her that R.P. had reported sexual abuse to the FBI, J.M. asked her not to tell the defendant. Mrs. Strain stated that she repeatedly asked J.M. for permission to talk to her husband about the claims. As the two sisters had heated discussions regarding the claims, the following text messages were exchanged:

> Mrs. Strain: My life is destroyed no matter where I stand
> Quit getting pissy with me
>
> J.M.: Yep..others Too!!!!
>
> Mrs. Strain: Not yours
>
> J.M.: Ohhh ok..f*** off...Leave me alone with this now too...U got the info u need...Ur right no more family...

Mrs. Strain: You were never going to support anyone but yourself. Never understood what u wanted from me.

J.M.: Ohhh yea right...I kept my mouth shut for 5 years...Only opened it because of it becoming an issue..should have let u get surprised by this when they showed up at ur door..ur a selfish bitch I want nothing?!! Done! Ur pissed at the wrong person sister

Mrs. Strain: Exactly u have had 5 yrs I've had two weeks I am sorry [J.M.] I am not angry just frustrated.

At trial, Mrs. Strain confirmed that she was not stating an opinion as to whether or not she believed the claims against her husband but was instead only stating that she had not had time to process the claims. We disagree with the defendant's argument that the text messages contained inadmissible opinions. To the contrary, based on our review, we find that the text messages did not consist of speculative opinions. Thus, we agree with the trial court's assessment that no reasonable juror could have interpreted the text messages as an opinion as to whether or not the defendant was guilty or innocent.

Considering the above analyses, we find no merit in assignments of error numbers two, three, and four. We further find no merit in assignment of error number one, in so far as the motion for new trial was based on the admission of above discussed evidence.

### ASSIGNMENTS OF ERROR NUMBERS 1 & 5: ADMISSION OF HEARSAY

In assignment of error number five, the defendant argues the trial court improperly admitted hearsay testimony regarding a phone conversation between J.M. and her son R.P., in which R.P. expressed anger over what the defendant "did to [him]." The defendant notes that the trial court found that the defense had put R.P.'s motive at issue in ruling that the State would be allowed to question J.M. regarding the content of the phone conversation. The defendant concludes that the trial court erred in admitting highly prejudicial hearsay testimony by J.M. regarding statements by R.P. to prove the truth of the matters he asserted.

Hearsay evidence is evidence of an out-of-court, unsworn, oral or written statement made by a person other than the testifying witness that is offered for the truth of its content. La. C.E. art. 801(C); State v. Moore, 18-0343, p. 6 (La. App. 1st Cir. 9/21/18), 2018 WL 4520543, *4, writ denied, 18-1813 (La. 4/15/19), 267 So. 3d 1130. Hearsay is inadmissible unless it falls within an exception. La. C.E. art. 802.

Louisiana Code of Evidence article 803 provides, in pertinent part, that the following is not excluded from evidence by the hearsay rule:

**(3) Then existing mental, emotional, or physical condition.**

A statement of the declarant's then existing **state of mind**, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or his future action. [Emphasis added.]

Evidence to prove the declarant's state of mind can be used to prove the declarant's subsequent conduct. See La. C.E. art. 803(3). The length of time between the making of the statement and the conduct in question does not determine the admissibility, but rather goes to the weight of the evidence. State v. Lee, 559 So. 2d 1310, 1319 (La. 1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991).

A state of mind declaration is relevant if it tends to make the existence of any consequential fact more or less probable than it would otherwise be without the evidence. See La. C.E. art. 401. Nevertheless, relevant declarations may be legally inadmissible if their probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misapplication by the jury. See La. C.E. art. 403; State v. Brown, 562 So.2d 868, 878 (La. 1990).

Extrajudicial statements of a declarant's subjective fear or revulsion have considerable probative value in circumstantially explaining the declarant's subsequent conduct. Even when the declarant's state of mind is not the ultimate

30

proposition to be proven, the declaration may be used as circumstantial evidence of the declarant's behavior by providing an intermediate basis for further inferences about declarant's conduct. Where extrajudicial declarations are offered to show the declarant's state of mind or intent to undertake a course of action, when the communication indicates the act is dependent upon an event or upon acts of another, the contingency operates only to reduce the probative force (weight) of the evidence, not its admissibility. State v. Ulfers, 07-0832, p. 38 (La. App. 1st Cir. 2/8/08), 2008 WL 441488, *20, writ denied, 08-1100 (La. 1/16/09), 998 So. 2d 90.

Herein, prior to testimony by Mrs. Strain and R.P., the State presented argument under La. C.E. art. 803(3) regarding the admissibility of a recorded phone conversation between R.P. and J.M. The State argued the statements consisted of R.P.'s spontaneous expression of his then existing mental, emotional, and physical condition at the time and were admissible to rebut the defense's claim that R.P. was blackmailed into making the claims against the defendant. The State noted R.P. would be available for cross-examination. Defense counsel argued the State's argument was flawed because the phone call took place on March 27, 2018, after R.P. had already met numerous times with the investigating agents. Defense counsel further argued that the evidence was being used to prove a fact in dispute (that R.P. was abused by the defendant) and therefore consists of inadmissible hearsay. The trial court ruled the recording inadmissible due to the lapse in time between the phone call and R.P.'s interview with law enforcement in 2017.

However, during the State's direct examination of J.M., the trial court overruled defense counsel's objection to the State eliciting testimony regarding R.P.'s statements during the phone call at issue. As specifically noted by the defendant in his appeal brief, the following exchange between the State and J.M. then took place on direct examination:

Q.   And what was that, what did [R.P.] call to tell you?

31

A. That he was "f\*\*\*\*\*\* mad" was his words. "I am f\*\*\*\*\*\* mad. I am f\*\*\*\*\*\* mad at all of them. No, Mom, I'm f\*\*\*\*\*\* mad at him. He should not have done what he did to me." And he was screaming and crying at the top of his lungs saying, "He should not have done this, he's the one who f\*\*\*\*\*\* did this."

Thus, the admission of testimony regarding the recording, not the recording itself which was ruled inadmissible, is at issue on appeal.

Initially, we recognize that the length of time between when the statements were made by R.P. in the phone call and the conduct in question (the alleged abuse) goes to the weight of the evidence, not its admissibility. See Lee, 559 So. 2d at 1319. We further find that the defense put R.P.'s state of mind at issue. Specifically, as noted in the context of the sufficiency of the evidence assignment of error, defense counsel cross-examined R.P. regarding a prior phone call wherein R.P. mentioned feeling "blackmailed." After listening to the recording of that prior call, R.P. admitted to telling his mother during that phone call that he felt the FBI was blackmailing him into providing pedophile information against the defendant based on his involvement with the work release program. Hence, the testimony regarding a separate phone call with J.M. that occurred a few months later, wherein R.P. expressed anger towards the defendant and his belief that the defendant "should pay" was introduced to counter the defense narrative that R.P. was being pressured by the FBI to testify.[17] Moreover, we find that the relevancy and probative value of the statements at issue far outweighed the danger of the jury misusing the evidence. The trial court properly ruled J.M.'s testimony regarding statements by R.P. admissible to show R.P.'s state of mind. Thus, assignment of error number five and assignment of error number one, to the extent that the defendant argues a new trial was warranted on the basis of the admission of

---

[17] We note that J.M.'s testimony is cumulative of R.P.'s testimony. R.P. testified prior to J.M. about the emotional phone call with his mother wherein he stated, in part, "[the defendant] needs to pay."

hearsay evidence, are without merit.

## ASSIGNMENTS OF ERROR NUMBERS 1 & 6:
## DENIAL OF JURY'S REQUEST TO VIEW EVIDENCE

In assignment of error number six, the defendant argues the trial court erred

in denying the jury's request during deliberations to view text messages between

the defendant and R.P., S.K., and V.K., which were admitted into evidence as

defense exhibits. He argues the text messages were not testimonial and were not

offered to prove the truth of their contents but, rather, to show the frequency in

communication, their friendly tone, and the nature of the relationships at issue. He

further argues they are of great relevance and notes they concerned present events,

similar to *res gestae* statements.[18]

Louisiana Code of Criminal Procedure article 793(A), in pertinent part,

provides:

> [A] juror must rely upon his memory in reaching a verdict. He shall
> not be permitted to refer to notes or to have access to any written
> evidence. Testimony shall not be repeated to the jury. Upon the
> request of a juror and in the discretion of the court, the jury may take
> with it or have sent to it any object or document received in evidence
> when a physical examination thereof is required to enable the jury to
> arrive at a verdict.

The general rule as expressed by Article 793 is that the jury is not to inspect

written evidence except for the sole purpose of a physical examination of the

document itself to determine an issue that does not require the examination of the

verbal contents of the document. Thus, jurors may inspect physical evidence in

order to arrive at a verdict, but they cannot inspect written evidence to assess its

verbal contents. State v. Perkins, 423 So. 2d 1103, 1109-10 (La. 1982); State v.

Washington, 11-0327, p. 5 (La. App. 1st Cir. 5/4/12), 2012 WL 1580939, *3, writ

denied, 12-1730 (La. 4/1/13), 110 So. 3d 138.

---

[18] *Res gestae* are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participant. See State v. Brooks, 01-0785, p. 3 (La. 1/14/03), 838 So.2d 725, 727.

Herein, the jury sent a note during deliberations stating, "We request all evidence." The State argued that written evidence shall not be permitted under the Louisiana Code of Evidence and objected to the submission of any written evidence. The defendant argued that the text messages were nonverbal, noting they are full of photos. The trial court sustained the State's objection, finding that the pictures of text messages were a form of written communication. Subsequently, the jury made another request asking, "Can we see all exhibits showing text messages?" The trial court denied the request, explaining that written evidence could not be sent back into the jury room for review.

We agree with the trial court's assessment and interpretation of the law. The jury's sole purpose for viewing these exhibits would be for the impermissible examination of their verbal contents. See State v. Caminita, 16-0121, p. 10 (La. App. 1st Cir. 9/16/16), 203 So. 3d 1100, 1108, writ denied, 16-2045 (La. 9/6/17), 224 So. 3d 988. We find the trial court did not err in refusing to allow the jury to view these exhibits during deliberations. Thus, we find no merit in assignment of error number six or assignment of error number one to the extent that it challenges the trial court rulings on the jury's deliberation requests.

### ASSIGNMENTS OF ERROR NUMBERS 1 & 7: GRANTING POTENTIAL WITNESSES' MOTION TO QUASH SUBPOENAS

In assignment of error number seven, the defendant argues the trial court erred in quashing the subpoenas for three defense witnesses, Terry King, Richard Franzo, and Gary Leonard. The defendant concludes that given the "gross inconsistencies" in M.F.'s allegations, testimony by one or more of these individuals would reveal additional inconsistencies for impeachment purposes.

A defendant's right to compulsory process for obtaining witnesses on his behalf is embodied in both the federal and state constitutions and in the statutory law of this state. See U.S. Const. amend. VI; La. Const. art. I, § 16. The court

34

shall issue subpoenas for the compulsory attendance of witnesses at hearings or trials when requested to do so by the State or the defendant. La. C.Cr.P. art. 731. The right of a defendant to compulsory process includes the right to demand subpoenas for witnesses and the right to have them served. State v. Latin, 412 So. 2d 1357, 1361 (La. 1982). In order for the defendant to show prejudicial error, he must demonstrate the testimony the witness might give which would be favorable to the defense and which would indicate the possibility of a different result if the witness were to testify. State v. Jarrell, 07-0412, p. 24 (La. App. 1st Cir. 9/19/07), 2007 WL 2726718, *13, writ denied, 07-2065 (La. 3/7/08), 977 So. 2d 897.

Herein, the potential witnesses moved to quash the subpoenas based on relevancy and admissibility. Counsel on behalf of the witnesses noted that the defendant maintained that certain statements were made by one of the victims (M.F.) that were inconsistent with other statements made by that victim. The witnesses' counsel further stated that neither the defendant nor the potential witnesses knew what statements were made by the victim that were inconsistent with other statements made by the victim. The witnesses' counsel further explained that his clients contend that the statements that they were aware of were consistent with statements made by M.F. as portrayed in the media. In response, defense counsel contended that the witnesses made social media posts and gave statements to the media indicating that M.F. told them "the same thing that he has told the media." Further contending that M.F.'s media statements were inconsistent with the information he provided to the investigating agents, defense counsel argued the witnesses' testimony would be significant to the defense's case. The trial court noted that based on defense counsel's argument, the potential witnesses at issue would be no different than any family member or other person to whom M.F. made statements that were consistent with his statements to the media. Thus, the trial court granted the motion to quash the subpoenas.

We find there has been an inadequate showing as to what testimony the potential witnesses might have given that would have been favorable to the defendant and which would indicate the possibility of a different result if the witnesses had testified. Accordingly, we find no prejudicial error related to the absence of the potential witnesses at issue. Thus, assignment of error number seven and the compulsory process basis for assignment of error number one lack merit.

## ASSIGNMENT OF ERROR NUMBER 10:
## DENIAL OF MOTION TO QUASH COUNTS 1 & 4 OF INDICTMENT

Finally, in assignment of error number ten, the defendant argues the charges on counts one through four violate the constitutional prohibition against *ex post facto* laws and that the trial court erred in denying his motion to quash on this basis. The defendant notes that the aggravated rapes charged in counts one through four took place in 1978 through 1981, when the defendant was between the ages of fifteen and eighteen years old.[19] He contends that as a result of the application of La. Ch.C. art. 857 and La. C.Cr.P. art. 875, both enacted after the instant offenses occurred to provide for prosecution as an adult for offenses committed as a child, the State no longer had the option to try him as a juvenile and was, instead, statutorily required to try him as an adult, subjecting him to a sentencing exposure of mandatory life imprisonment.

A defendant is to be tried and sentenced under the statute that was in effect at the time he committed the crime. State v. Bethley, 452 So. 2d 367, 370 (La. App. 1st Cir. 1984). Article I, § 10 of the United States Constitution and La. Const. art. I, § 23 prohibit *ex post facto* application of the criminal law by the State. State v. Everett, 00-2998, p. 13 (La. 5/14/02), 816 So. 2d 1272, 1280. The

---

[19] Counts one and four have the earliest possible date of occurrence in accordance with the indictment. While the defendant contests counts one through four on appeal, below, he moved to quash counts one and four. Nevertheless, the range of dates on counts two and three are encompassed within the ranges provided on counts one and four.

United States Supreme Court has identified four categories of law that violate the *ex post facto* prohibition: 1) any law that makes an action criminal that was innocent when done before the passing of the law; 2) any law that aggravates a crime or makes it greater than it was when committed; 3) any law that changes the punishment and inflicts greater punishment than the law provided when the crime was committed; and 4) any law that alters the legal rules of evidence and requires less or different testimony than was required at the time the offense was committed, in order to obtain a conviction. Rogers v. Tennessee, 532 U.S. 451, 456, 121 S.Ct. 1693, 1697, 149 L.Ed.2d 697 (2001). In State ex rel. Olivieri v. State, 00-0172, 00-1767, p. 15 (La. 2/21/01), 779 So. 2d 735, 744, cert. denied, 533 U.S. 936, 121 S.Ct. 2566, 150 L.Ed.2d 730 (2001), the Louisiana Supreme Court held that in determining whether there has been an *ex post facto* violation, the analysis should focus on whether the new law redefines criminal conduct or increases the penalty by which the conduct is punished, and not whether the defendant has simply been disadvantaged.

Prior to trial, the defendant filed a motion to quash counts one and four of the indictment, which was denied by the trial court, citing State ex rel. Coco, 363 So. 2d 207, 210-11 (La. 1978) (holding that jurisdiction vests in the district court for first-degree murder and aggravated rape when committed by a juvenile, fifteen years or older, and that jurisdiction attaches where indictment is found or bill of information is filed). At the time the aggravated rape offenses at issue were committed,[20] former La. R.S. 13:1570(A)(5) (repealed by Acts 1991, No. 235, § 17, effective 1992) provided for the initiation of prosecution in the district court of juveniles, fifteen years of age or older, charged with having committed a "capital crime, or a crime defined by any law defining attempted aggravated rape," and La.

---

[20] The offenses at issue occurred prior to the enactment of the Louisiana Children's Code in 1991.

R.S. 13:1571.1, et seq. (the Juvenile Transfer Act-Act 568 of 1974 as amended by Act 337 of 1975, also repealed in 1991, effective 1992) provided that juvenile defendants, age fifteen years or older, could be tried as adults in the district court provided transfer proceedings were conducted in the juvenile court in accordance with the provisions of La. R.S. 13:1571.1. State v. Bowden, 406 So. 2d 1316, 1320 (La. 1981). Even based on the earliest date in the indictment, the defendant was over fifteen years old when the offenses were committed and thus was subject to trial as an adult and a penalty of life imprisonment without parole.

As the defendant notes, 2008 La. Acts, No. 670, § 1, amended La. Ch.C. art. 857, by adding subsection (C)(2), as follows:

> An adult who is charged with an offense committed at the time he was a child for which the time limitation for the institution of prosecution pursuant to Code of Criminal Procedure Art. 571 has not lapsed and for which he was not subject to prosecution as an adult due to his age at the time the offense was committed may be prosecuted as an adult in the appropriate court exercising criminal jurisdiction. If convicted, he shall be committed to the custody of the Department of Public Safety and Corrections to be confined in secure placement for a period of time as determined by the court not to exceed the maximum amount of confinement he could have been ordered to serve had he been adjudicated for the offense as a child at the time the offense was committed.

Likewise, 2008 La. Acts, No. 670, § 2 amended La. C.Cr.P. art. 876 by adding subsection (B):

> An adult who is charged with an offense committed at the time he was a child for which the time limitation for the institution of prosecution pursuant to [Code of Criminal Procedure] Article 571 has not lapsed and for which he was not subject to prosecution as an adult due to his age at the time the offense was committed may be prosecuted as an adult in the appropriate court exercising criminal jurisdiction. If convicted, he may be committed to the custody of the Department of Public Safety and Corrections to be confined in secure placement for a period of time as determined by the court not to exceed the maximum amount of confinement he could have been ordered to serve had he been adjudicated for the offense as a child at the time the offense was committed.

Both statutes were amended again by 2010 La. Acts, No. 805, §§ 1 & 2 to provide that such individuals *shall* be prosecuted as adults.

As the above enactments of 2008 La. Acts, No. 670 do not redefine criminal conduct or increase the penalty by which it is punished, their application does not run afoul of the prohibition against *ex post facto* laws. They simply allow the courts to impose the term of incarceration that could have been imposed at the time of the offense, had the defendant not avoided prosecution at that time, i.e., life imprisonment without parole. See State v. Odoms, 11-2092, pp. 8-9 (La. App. 1st Cir. 6/8/12), 94 So. 3d 166, 171-72, writ denied, 12-1612 (La. 2/22/13), 108 So. 3d 762 (wherein this court addressed the same *ex post facto* claim raised by the defendant herein; confirming that La. Ch.C. art. 857(C)(2) prohibits offenders from evading punishment for juvenile crimes, even if the offenses are not discovered before adulthood, that could have been imposed at the time of the offense). We are not persuaded by the defendant's argument regarding his hypothetical prosecution as a child despite him being old enough to be transferred to adult court when the offenses were committed. As the Louisiana Supreme Court found in Coco, the district court would have had jurisdiction over the defendant's case had he been tried when the offenses were committed. See Coco, 363 So. 2d at 210-211. Since the defendant could have been prosecuted as an adult and therefore subject to the same sentences imposed herein, we find no *ex post facto* violation in this case. Assignment of error number ten lacks merit.

**CONVICTIONS AND SENTENCES AFFIRMED.**